429 F.2d 725
 The NATIONAL WELFARE RIGHTS ORGANIZATION et al., Appellants,
v.
The Honorable Robert FINCH, Secretary, United States Department of Health, Education and Welfare, et al.
NATIONAL WELFARE RIGHTS ORGANIZATION et al., Appellants,
v.
The Honorable Robert FINCH, Secretary, United States Department of Health, Education and Welfare.
 No. 23787.
 No. 23890.
 United States Court of Appeals, District of Columbia Circuit.
 Argued February 27, 1970.
 Decided June 9, 1970.
 
 Mr. John W. Douglas, Washington, D. C., for appellants. Messrs. Roger L. Rice and Stephen Wexler and Mrs. Florence Roisman, Washington, D. C., were on the brief for appellants.
 Mr. Raymond D. Battocchi, Attorney, Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Attorney, Department of Justice, were on the brief, for appellees. Mr. Nathan Dodell, Asst. U. S. Atty., also entered an appearance for appellees.
 Mr. Norman K. Janes, Willimantic, Conn., William H. Clendenen, Jr., New Haven, Conn., filed a brief on behalf of Quinnipiac Welfare Rights Mothers, Farnum Courts Welfare Rights Mothers, Willimantic Welfare Rights Mothers, and Togetherness Is Everyone, as amici curiae.
 Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In November 1969 the Department of Health, Education and Welfare announced that in December 1969 and January 1970 hearings would be held to determine whether the welfare laws of the states of Nevada and Connecticut respectively were in conformity with certain federal standards in the Social Security Act so that those states might continue to receive payments of federal aid for their state welfare assistance programs. Plaintiff-appellants, a national voluntary association of welfare recipients, state affiliate organizations in Nevada and Connecticut, and welfare recipients individually and in behalf of all welfare recipients and needy children[1] requested that they be permitted to participate as parties in the hearings.[2] When the request was refused, appellants sought injunctive relief in the District Court incident to their main action in the nature of a mandamus. Although this is an appeal from a denial of a preliminary injunction, we here decide the merits of the controversy in view of the expression of the parties that such a determination is desirable and since the issues are ripe for adjudication on this record.[3]
 
 
 2
 * The Social Security Act of 1935 established several grant-in-aid programs[4] whereby any state at its option might apply for federal funds to allocate to its welfare assistance programs for certain statutorily specified categories of needy individuals and families.[5] At present in order to participate in these programs, the state must submit the plans for its program in any of the categories to the Secretary of Health, Education and Welfare. The Secretary's duty is to measure the plan against standards which Congress has designated for each program. If the state plan meets the designated requirements, the Secretary "shall approve" it.[6]
 
 
 3
 Existing approved plans continue to bear the Secretary's scrutiny. He may discontinue payments if he finds that the plans, as written or as applied, no longer conform to federal standards. An administrative review procedure for testing continued conformity of an approved plan is provided. Before funds may be cut off the Secretary must "give reasonable notice and opportunity for hearing" to the state agency administering the plan. The Secretary has implemented this requirement in the Act by a regulation[7] favoring informal negotiations between state officials and HEW representatives as an initial step toward conformity, with subsequent resort to formal hearings if resolution is not reached by informal means. Any state which objects to a determination of the Secretary arising out of negotiations or a hearing may seek review of that determination in the United States Court of Appeals for the circuit in which the state is located.[8]
 
 
 4
 Both Nevada and Connecticut have federally approved state plans funded under the Aid to Families with Dependent Children (AFDC) Program,[9] which provides welfare assistance to children who are deprived of adequate parental support.[10] The requirements section of the AFDC, 402, 42 U.S.C. § 602,[11] was amplified in 1968 when Congress adopted several amendments to the Social Security Act[12] with the result that states with AFDC plans were required to submit modified plans. When, even after informal negotiations,[13] no amended plans were forthcoming from the states of Nevada and Connecticut, among others, the Administrator of the Social and Rehabilitation Service of HEW, who has been delegated responsibility for the administration of the AFDC program,[14] initiated action. Nevada and Connecticut officials were notified by letters from the Administrator on November 14, 1969, that a hearing to determine the matter of continued conformity had been set for each state.[15] In the letter of notification to Nevada welfare officials, the Administrator "anticipated" that the issues to be explored in the hearing would pertain to the state's cooperative plan with the United States Department of Labor's Work Incentive plan, the state's provision for the disregard of amounts of earned income when considering the need factor of a family, and its provisions for certain child care services.[16] Connecticut's AFDC plan, according to the notification, may not properly implement federal disregard of income regulations, may lack a simplified plan for determining eligibility, may improperly exclude children eligible under federal standards, and may be deficient in its service programs for AFDC families and children.[17]
 
 
 5
 It was shortly after these notifications that public announcement of the impending hearings was made and that the Nevada appellants in correspondence with the Administrator requested that they be granted "status as a party"[18] at the Nevada hearing. The request further expressed an interest in expanding the issues set down for hearing.[19] A postponement of the hearing followed and appellants were sent a letter informing them of the postponement and of Nevada's willingness to negotiate in an effort to resolve the issues without hearing. Upon learning of the postponement, appellants responded that "we urgently request that no order of any kind of any settlement agreement be made unless NWRO and the persons it represents be permitted to be heard." The Administrator replied that negotiations concerning state compliance are to be settled between the state and HEW and that the inclusion of third parties is inappropriate, but that appellants could submit information or arguments in connection with the negotiations. These events precipitated the present litigation as to the state of Nevada.
 
 
 6
 The events preceding the proposed Connecticut hearing were similar. There was a public announcement, a change in the dates, a request by Connecticut welfare groups and individuals to intervene and a rejection of that request by the Department. However, no effort appears to have been made to rely on negotiations, for the preparations for a hearing on January 20, 1970 proceeded and had actually commenced when this court, after denial of injunctive relief in the District Court, entered an order applying to the Connecticut hearing the order entered on January 2 which enjoined the Nevada hearing pendente lite.[20]
 
 II
 
 7
 Appellees read the Social Security Act to provide that the Department of Health, Education and Welfare and the state shall be the exclusive participants in the prehearing negotiations and the formal conformity hearings.[21] Appellees contend that congressional silence on participation by any other interest groups or individuals is clear evidence of Congress' determination not to confer any role in the administration of state conformity on other groups or individuals. Thus Congress has entrusted exclusive responsibility for surveillance of state plans to the Secretary. In this submission, they rely on the statutory scheme which speaks only of the functions of the Secretary and the rights of the state to a hearing and judicial review.
 
 
 8
 An extension of this argument is that the decisions relied upon by appellants, e. g., Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App. D.C. 328, 359 F.2d 994 (1966), involved applications for intervention before agencies governed by specific statutes conferring standing on collateral "parties in interest" and Congress has passed no such explicit statute here. Certainly past intervention controversies have for the most part involved regulatory statutes which did embody definite provisions governing intervention[22] or which did include judicial review sections from which a right of intervention could be deduced.[23] Nevertheless, specific statutory provisions explicitly controlling intervention are exceptional[24] when viewed in the context of all legislative enactments pertaining to administrative proceedings. Additionally, there is some suggestion that such explicit provisions, commonly referred to in terms of allowing suits by "private attorneys general," may represent special recognition by Congress of a need to have interested parties involved in agency proceedings to protect the public interest.[25]
 
 
 9
 That congressional silence on specific grants of standing does not require the inference which appellees would draw is suggested by the emerging principles in the area of standing to seek judicial review of administrative action. Although by no means concomitant, "[t]he problem of right to intervene in administrative proceedings is closely related to and in some measure governed by the elaborate body of law concerning standing to challenge and to enforce administrative action."[26] Cases concerning the question of standing before one or the other tribunal have been used interchangeably in resolving questions of standing to intervene.[27] Except for the adjustments necessary for assuring the manageability of administrative proceedings, the criteria for standing for review of agency action appear to assimilate the criteria for standing to intervene. Neither the administrative nor the judicial concepts of standing have remained static.[28] In both the trend has been away from the closed concept of legally protected interest as the basis of standing to criteria such as "economic injury" of a competitor or "electrical interference" or "representation of the public interest by persons aggrieved-in-fact."[29]
 
 
 10
 The Supreme Court has recently made clear that standing for purposes of judicial review need not flow from any express congressional grant. In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), companion cases, standing to challenge administrative action was found to turn on a flexible, liberalized formula in which two conditions are central: (1) "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise" and (2) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Data Processing Service, supra, 397 U.S. at 152, 153, 90 S.Ct. at 829. Mr. Justice Brennan's concurring approach makes standing even more basic by its dependence simply on an allegation of injury in fact, i. e., "[the petitioner] has only to allege that he has suffered harm as a result of the defendant's action." Barlow v. Collins, supra, 397 U.S. at 172 n. 5, 90 S.Ct. at 841 (concurring opinion). Applying these criteria the Court found that vendors of data processing service have standing to challenge a ruling by the Comptroller of the Currency that, as an incident to their banking services, national banks may make data processing services available to other banks and to bank customers, and that tenant farmers have standing to challenge the validity of an amended regulation promulgated by the Secretary of Agriculture permitting the farmers to assign payments under the Upland Cotton program to landlords.
 
 
 11
 In arriving at these holdings, the Administrative Procedure Act served as a guide for the discernment of congressional intent, at least as to reviewability:[30] "Whether agency action is reviewable often poses difficult questions of congressional intent; and the Court must decide if Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." Barlow v. Collins, supra, 397 U.S. at 165, 90 S.Ct. at 837. If not, the provisions of the Act authorizing judicial review apply. 80 Stat. 392, 5 U.S.C. § 701(a). Since in Data Processing Service and in Barlow neither preclusion of judicial review nor commitment to legislative discretion was found, the Court proceeded to apply Section 702 of the Act.[31] Under Section 702 "the Administrative Procedure Act grants standing to a person `aggrieved by agency action within the meaning of a relevant statute.'" Data Processing Service, supra, 397 U.S. at 153, 90 S.Ct. at 830. Included "within the meaning of a relevant statute" are persons intended to be the beneficiaries of the statutory scheme.[32] Thus the relevant statute is the conduit of standing; no express grant of standing need be found. The "legal interest" test is declared a matter distinct from the problem of standing. The question of legally protected interest goes to the merits.[33]
 
 
 12
 The principles for determining standing enunciated in Data Processing Service and Barlow, supra, assure appellants of standing to seek judicial review of the outcome of a conformity hearing. They will first have to show "that the challenged action has caused [them] injury in fact, economic or otherwise." Data Processing Service v. Camp, supra, 397 U.S. at 152, 90 S.Ct. at 829. As recipients of benefits of the welfare assistance programs, they no doubt will have the requisite "personal stake in the outcome" of the suit — an economic stake. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[34] The second requirement of standing, that plaintiffs be "within the zone of interests to be protected by the Act," Barlow v. Collins, supra, 397 U.S. at 164, 90 S.Ct. at 836, is readily met.[35] The purposes of the Social Security Act make clear that appellants, if qualified as welfare recipients in their respective states,[36] fall within the class of persons intended as beneficiaries of that statute. The enactment of social security legislation in 1935 was, according to the legislative history, to enable "the several states to make more adequate provision for aged persons, dependent and crippled children, maternal and child welfare * * *."[37]
 
 
 13
 Since appellants have no difficulty in satisfying the two requirements of standing announced in Data Processing Service-Barlow, judicial review is available to them unless "Congress has in express or implied terms precluded judicial review or committed the challenged action entirely to administrative discretion." Barlow v. Collins, supra, 397 U.S. at 165, 90 S.Ct. at 837. In that regard, we have found no language in the Social Security Act expressly prohibiting welfare recipients' pursuit of review,[38] and 42 U.S.C. § 1316(a) (3), providing that "[a]ny State which is dissatisfied with a final determination of the Secretary [may] file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination," obviates the issue of agency discretion over conformity resolution.
 
 
 14
 Yet there remains the possibility of an implied exclusion of welfare recipients. As for implied prohibition, the Court has suggested a test. "[J]udicial review of such administrative action is the rule, and nonreviewability an exception which must be demonstrated." Barlow v. Collins, supra, 397 U.S. at 166, 90 S.Ct. at 838. Nonreviewability will be found "only upon a showing of `clear and convincing evidence' of legislative intent." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Appellees argue that the enactment by Congress in 1965 of 42 U.S.C. § 1316 purposefully gave review to the states and by implication intentionally excluded welfare recipients. But such an inference should not be made "unless there is persuasive reason to believe that such was the purpose of Congress." Id. at 140, 87 S.Ct. at 1511.
 
 
 15
 The legislative history indicates that Congress gave the states standing in order to strengthen federalism. Review procedures
 
 
 16
 "would place the States on an equal basis with the Federal Government in the administration of the public assistance programs, [for as] the situation now stands, the Federal agency definitely has the upper hand in the Federal-State partnership because there is no recourse for the State beyond the decision of the Secretary * * *."[39]
 
 
 17
 Clearly, it is not contrary to that purpose that welfare recipients also have standing to seek review. The fact that the statute in question explicitly gave judicial review to the states and said nothing about welfare recipients is not "clear and convincing evidence" that Congress intended to deny review to the primary beneficiaries under the statute. Thus we agree with Judge Lumbard in Rosado v. Wyman, 414 F.2d 170 (2d Cir. 1969), reversed on other grounds, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970): "The Department's determination, it should be noted, will be reviewable in the courts at the instance of either the state, under 42 U.S.C. § 1316(a) (3) (Supp. 1969), or the plaintiffs under the Administrative Procedure Act." Concurring opinion at 181.
 
 
 18
 The right of judicial review cannot be taken as fully realized, however, if appellants are excluded from participating in the proceeding to be reviewed. Such was the basis of Judge Lumbard's opinion for the court in American Communications Association v. United States, 298 F.2d 648, 650-651 (2d Cir. 1962).
 
 
 19
 "Although this is not a case * * * where any potentially aggrieved person must in fairness be permitted to intervene at the hearing stage because only `parties' can seek judicial review, a similar principle applies to the present situation. In National Coal [Ass'n v. FPC, 89 U.S.App.D.C. 135, 191 F.2d 462 (1951)] intervention was necessary to secure the right to review; here intervention is necessary in order to make the right to review effective. [Petitioning for the taking of new evidence by the Commission] is not an effective substitute for the right to adduce evidence, to cross examine witnesses, and to present arguments at the initial hearing. * * *"
 
 
 20
 (Emphasis added.) Judge Lumbard's view was foreshadowed as long ago as 1935 when Associate Justice Groner in a dissent likened a decision denying prejudicial review participation to "locking the stable door after the horse is gone." Sykes v. Jenny Wren Co., 64 App.D.C. 379, 78 F.2d 729, cert. denied, 296 U.S. 624, 56 S.Ct. 147, 80 L.Ed. 443 (1935). Judge Lumbard's view has received more recent corroboration in a dissenting opinion of Judge Sobeloff in First National Bank of Smithfield, North Carolina v. Saxon, 352 F.2d 267 (4th Cir. 1965). The majority held that, although the competitor of a national bank had a right to judicial review of the authorization granted by the Comptroller of Currency to establish a branch of a national bank, neither due process nor the Administrative Procedure Act required the holding of an administrative hearing for that decision. Of this decision Judge Sobeloff said:
 
 
 21
 "* * * Rightly, I think, the majority holds that this interest is sufficient to entitle the Smithfield bank to appeal from the Comptroller's decision granting the application. Smithfield contends, however, that this right of appeal is meaningless unless it has previously been given an effective chance to be heard before the Comptroller reaches his final decision on the merits of the application. With this contention I agree * * *. * * * "* * * If an objector has been granted no adequate opportunity to present his position before the case reaches the district court stage, a protest will usually be of little avail since the decision under attack comes clothed with a presumption of correctness."
 
 
 22
 Id. at 273-274 (dissenting). (Emphasis in original.)
 
 
 23
 Similarly, without participation in the administrative hearing, issues which appellants here might wish to raise about the character of the state's plans may have been foreclosed as a topic for review. Moreover, under 42 U.S.C. § 1316 (a) (4) the Secretary's finding of fact if supported by substantial evidence will be conclusive, both with respect to the content of the state's plans and with respect to the character of the state's administrative machinery and behavior. This limited review underscores the need for appellants' participation in the administrative hearing as a party.[40]
 
 
 24
 Nor should it be thought that this right to judicial review is completed by the court's authority to remand "the case to the Secretary to take further evidence."[41] The thrust of Judge Lumbard's opinion in American Communications suggests the contrary, that is, that such reconsideration is not an adequate substitute for full participation in the initial agency hearing and that a procedure which encourages remand hearings can be wasteful and obstructive in addition to not advancing the public interest. We agree.
 
 
 25
 Besides functioning as a means of perfecting the right to review, intervention will serve to foster an important legislative goal. The Social Security Act of 1935 was expressly enacted "to provide for the general welfare."[42] The importance of welfare legislation for the common good of the public is undisputed:
 
 
 26
 "* * * From its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize that forces not within the control of the poor contribute to their poverty. This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to `promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity.' * * *"
 
 
 27
 Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1019 (1970). As intervenors in conformity hearings appellants may serve the public interest in the maintenance of an efficient state-federal co-operative welfare system. Appellants' role would be analogous to that of persons accorded standing, not for the protection of their own private interests, but because they are especially well suited to represent an element of the public interest. Thus they serve as "private attorneys general." F.C.C. v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); Associated Industries of New York v. Ickes, 134 F.2d 694 (2d Cir.), vacated on suggestion of mootness, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943); Office of Communication of United Church of Christ v. F.C.C., supra.
 
 
 28
 Appellees argue that this case should be affirmed on the authority of Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). In Rosado welfare recipients brought an action in the United States District Court to enjoin New York welfare authorities from complying with a New York statute affecting their welfare. In upholding the right of the recipients to bring the action over a claim of failure to exhaust administrative remedies, the Court stated:
 
 
 29
 "* * * Petitioners do not seek review of an administrative order, nor could they have obtained an administrative ruling since HEW has no procedures whereby welfare recipients may trigger and participate in the Department's review of state welfare programs. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136 [87 S.Ct. 1507, 18 L.Ed.2d 681] (1967); K. Davis, Administrative Law § 19.01 (1965); L. Jaffe, Judicial Control of Administrative Action 425 (1965)."
 
 
 30
 397 U.S. at 406, 90 S.Ct. at 1215. In Rosado there was no administrative hearing scheduled before HEW and, as the Court indicated, the welfare recipients had no way to "trigger and participate in the Department's review of state welfare programs." By contrast, here there is such a hearing procedure already triggered and no reason appears why the recipients should not be permitted to participate in it to protect their rights and avoid a multiplicity of suits. The Court in Rosado viewed "with concern the escalating involvement of federal courts in this highly complicated area of welfare benefits," and suggested that welfare cases "should be formally placed under the supervision of HEW, at least in the first instance * * *." 397 U.S. at 422, 90 S.Ct. at 1222. Our decision today in this case is a first step in the implementation of that suggestion.
 
 III
 
 31
 It is true that increased participation through intervention creates problems for both the tribunal and other parties; multiple and extended cross-examination may be deleterious to the administrative process.[43] Agencies may fear that "their processes will be inundated by expansion of standing criteria."[44] Certainly keeping conformity hearings manageable may be a legitimate interest, but as this court set out in Virginia Petroleum Jobbers Ass'n v. F.P.C., 105 U.S.App.D.C. 172, 176 n. 1, 265 F.2d 364, 367 n. 1 (1959):
 
 
 32
 "* * * Efficient and expeditious hearings should be achieved, not by excluding parties who have a right to participate, but by controlling the proceeding so that all participants are required to adhere to the issues and to refrain from introducing cumulative or irrelevant evidence."
 
 
 33
 The threat of hundreds of intervenors in conformity hearings is more apparent than real. The expense of participation, particularly for welfare beneficiaries, is a factor limiting participation; legal and related expenses can be burdensome. Moreover, as Scenic Hudson established for the FPC, agencies have some discretion in limiting intervention.
 
 
 34
 "* * * Representation of common interests by an organization such as [intervenors] serves to limit the number of those who might otherwise apply for intervention and serves to expedite the administrative process."[45]
 
 
 35
 In the sorts of action under consideration here, the National Organization and the relevant state organization could be expected to serve the common good of all welfare recipients involved. There exists a unity of interest among the class of welfare recipients which appellants may represent.
 
 
 36
 In finding that appellants may intervene in a conformity hearing called by the Secretary under 42 U.S.C. § 604 (a), we contemplate enlargement of the rights of participation already accorded them only to the extent of an additional right to present live witnesses and to cross-examine witnesses for other parties.[46] We do not hold that this intervenor status creates in appellants a right to participate in any way in the Secretary's informal efforts, before or after the calling of a hearing, to bring a state into conformity, nor do we limit his right to terminate a hearing, once called or begun, upon a determination by him that it is no longer necessary because he believes that conformity has been achieved. In such event, appellants are free to question that determination either indirectly by proceeding against the state, Rosado v. Wyman, supra, or directly against the Secretary by a suit asserting that he is acting beyond, or in conflict with, his statutory authority, cf. Peoples v. United States Dept. of Agriculture, 138 U.S.App.D.C. ___, 427 F.2d 561 (1970). In order to enhance orderly procedures regarding any such litigation as may ensue, the Secretary should provide the parties to a conformity hearing with a preliminary statement of his purpose to terminate the hearing, along with a statement of his reasons for termination and a copy of the proposed state plan on which the state and he have settled. The parties should then be afforded the opportunity to submit, for the Secretary's consideration and for the record, their views as to, or any information bearing upon, the merits of the proposed plan and the reasons for terminating the conformity hearing.
 
 
 37
 These cases are remanded for further proceedings consistent with this opinion.
 
 
 38
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 Plaintiff National Welfare Rights Organization is described as a group with more than 70,000 members in 46 states which assists its members in seeking redress of their legal grievances under the welfare laws, informs and educates its members of their legal rights, and generally acts as the public voice for welfare recipients
 Other plaintiff-appellants are the Las Vegas and Reno Welfare Rights Organizations, the Waterbury Welfare Rights Organizations, and the New Haven Moms.
 
 
 [2]
 The Connecticut parties' interest in participating in the Connecticut hearing was not formally communicated until January 12, 1970, by which time most events surrounding the Nevada hearing, including judicial action, had occurred
 
 
 [3]
 Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Association for Benefit of Non-Contract Employees v. National Mediation Board, 218 F.Supp. 114 (D.D.C.1963), affirmed sub nom. United Air Lines, Inc. v. National Mediation Board, 117 U.S.App.D.C. 387, 330 F.2d 853 (1964), reversed on other grounds sub nom. Brotherhood of Ry. and S. Clerks, Freight Handlers, Exp. and Station Emp. v. Association for Benefit, 380 U.S. 650, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965). "Normally, of course, such consideration of the merits would be heard later, and a preliminary injunction would issue solely on the basis of irreparable injury, the balance of convenience, and the public interest * * *. In this case, however, the Court deems it appropriate to proceed immediately to the merits of the issues. The Court does so because the merits have been fully briefed and argued on the motion for preliminary injunction, and because there are no disputed facts." 218 F.Supp. at 122.
 The parties' memoranda below and their briefs filed in this appeal show the extent to which the merits have been argued at both stages of the proceedings, as do the District Judge's findings. No factual matters are in dispute.
 
 
 [4]
 49 Stat. 620, as amended, 42 U.S.C. §§ 301-1394 (1964 and Supp. IV 1965-1968)
 
 
 [5]
 Old Age Assistance (OAA), 42 U.S.C. § 301et seq.; Aid to Families With Dependent Children (AFDC), § 601 et seq.; Aid to the Blind (AB), § 1201 et seq.; Aid for the Permanently and Totally Disabled (APTD), § 1351 et seq.; and Medical Assistance (MA), 42 U.S.C. § 1396 et seq.
 
 
 [6]
 See, e. g., 42 U.S.C. § 302(b): "The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) * * *."
 
 
 [7]
 45 C.F.R. § 201.5 (1969) provides:
 (a) When withheld. Certification of grants to a State is withheld if the Commissioners, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of an approved plan, finds:
 (1) That the plan has been so changed that it no longer complies with the provisions of section 2, 402, 1002, 1402, or 1602 of the Act; or
 (2) That in the administration of the plan there is a failure to comply substantially with any such provision.
 * * * * *
 (c) Informal discussions. Hearings with respect to matters under paragraph (a) * * * of this section are generally not called, however, until after reasonable effort has been made by regional and central office representatives to resolve the questions involved by conference and discussion with State officials. Formal notification of the date and place of hearing does not foreclose further negotiations with State officials.
 (d) Conduct of hearings. Applicable requirements of the Administrative Procedure Act are observed in conducting the hearings referred to in paragrap[h] (a) * * * of this section.
 
 
 [8]
 42 U.S.C. § 1316(a) (3) (Supp. IV 1965-1968):
 "Any State which is dissatisfied with a final determination of the Secretary under section 304, 604, 1204, 1354, 1384, or 1396c of this title may, within 60 days after it has been notified of such determination, file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The Secretary thereupon shall file in the court the record of the proceedings on which he based his determination as provided in section 2112 of Title 28."
 
 
 [9]
 42 U.S.C. §§ 601-610 (Supp. IV 1965-1968)
 
 
 [10]
 A "dependent child" is defined in § 406 of the Act, 42 U.S.C. § 606(a), as "a needy child * * * who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandmother, grandfather * * *."
 
 
 [11]
 Examples of conditions to be fulfilled by the state under this section are: "A State plan * * * must * * * provide that it shall be in effect in all political subdivisions of the State * * *; * * * provide for financial participation by the State; * * * either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency to supervise the administration of the plan; [and] provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for aid to families with dependent children is denied or is not acted upon with reasonable promptness * * *." 42 U.S.C. § 602(a) (1)-(4)
 
 
 [12]
 E. g., § 402(a) (19), which requires the state to provide for referral of certain individuals to the Work Incentive Programs established by the Secretary of Labor and to contribute 20% of the cost of the program; § 402(a) (8) (A) (ii), which provides that the states shall, when determining the needs of eligible members of a family, disregard specified amounts of earned income of certain members; § 402(a) (14) and (15), which requires the states to provide for programs of services to families with dependent children, including child care services for parents who are required by the state to achieve training and employment.
 The amendments, adopted by Congress on December 15, 1967, were approved by the President on January 2, 1968, and became Public Law 90-248, 80 Stat. 821.
 
 
 [13]
 The extent to which informal negotiations were pursued by the Department and Connecticut officials is unclear
 
 
 [14]
 Section 1102 of the Act, 42 U.S.C. § 1302 (1964), empowers the Secretary to "publish such rules and regulations, not inconsistent with [the Act], as may be necessary to the efficient administration of the functions with which [he] is charged under [the Act]."
 
 
 [15]
 In addition to Connecticut's Aid to Dependent Children Program, its program for Old Age Assistance, for Aid to the Blind, and for Medical Assistance are at issue in the conformity procedures
 
 
 [16]
 As set out in detail in the notification letter, the issues are:
 (1) Whether the State agency has failed to submit a State plan amendment for the Work Incentive Program as required by section 402 (a) (19) of the Social Security Act and 45 CFR 220.35. The Social Security Amendments of 1967 (sec. 204(c) (1) of P.L. 90-248) made the Work Incentive Program mandatory as of July 1, 1968, except for any State prevented by State statute from complying on such date, and mandatory for all States by July 1, 1969.
 (2) Whether the State plan provision for disregarding earned income, which imposes a ceiling on the amount to be disregarded, is in compliance with section 402(a) (8) (A) (ii) of the Social Security Act and 45 CFR 233.20(a) (11) (ii) (b) which require, effective July 1, 1969, that the first $30 of total earned income for a month of the individuals specified in such provisions of the law and regulations plus one-third of the remainder of their earned income for the month must be disregarded.
 (3) Whether the State plan provisions with respect to child care services for parents for whom the State agency requires training or employment meet the Federal requirements. The agency will only assist parents to find suitable and adequate child care provided such care can be made available without cost to the State. Under the Federal law and policy, section 402(a) (14) and (15) of the Social Security Act and 45 CFR 220.18(a), child care services must be provided to such persons at agency cost if necessary.
 
 
 [17]
 The notification letter to Connecticut officials described the issues to be raised as follows:
 Whether the State's AFDC plan provision for disregarding earned income is in compliance with Section 402(a) (8) (A) (ii) of the Social Security Act * * *. The State's provision makes the earnings exemption applicable only if AFDC was received for any one of the four preceding months, with the result that an applicant for AFDC, with income (including earnings) below the assistance standard, does not receive the $30 and 1/3 disregard of earned income until after assistance has been received for a month. The Federal requirements, effective July 1, 1969, are that the first $30 of total earned income for a month, of the individuals specified in such provisions of the law and regulations, plus one-third of the remainder of their earned income for the month be disregarded.
 * * * * *
 Whether the State's AFDC plan provision relating to the method of disregarding earned income, which states that for persons to whom the incentive earnings apply (a) deduct expenses of employment, (b) disregard the first $30 per month of earned income and one-third of all additional income earned in the month, is in compliance with [the required] use of a method under which the applicable amounts of earned income to be disregarded will be deducted from the "gross amount" of earned income, and all work expenses, personal and non-personal, "will then be deducted."
 * * * * *
 Whether, because the State agency has failed to submit State plan amendments on a Simplified Method for Determination of Eligibility, the State [plan under Title IV (Part A) of the Social Security Act is in compliance with the requirement] that a State plan for [AFDC] must provide, effective no later than July 1, 1969, for use of a simplified method of eligibility determination on a test basis in selected local units.
 * * * * *
 Whether the State's AFDC plan provision which states that where a woman and unrelated male live together, only the woman and her children who are not related to the man may qualify for AFDC, thus excluding the unrelated male, his children and their children from eligibility for AFDC on a basis unrelated to their need, is in compliance with Section 406(a) of the Social Security Act * * * implementing the Supreme Court decision King v. Smith, and whether it is an arbitrary exclusion inconsistent with the purposes of Title IV-A of the Act.
 * * * * *
 Whether the State plan under Title IV, Part A of the Social Security Act, in light of the State agency's failure to submit Title IV-A and B plan material for Service Programs for Families and Children by April 30, 1969, is in compliance with Section 402(a) of the Social Security Act * * *.
 
 
 [18]
 Such status, as sought by appellants, would include:
 (1) The right to present evidence on all matters raised at these hearings;
 (2) The right to cross-examine witnesses whether presented by the Department, Nevada or any other party;
 (3) The right to propose findings on which the Administrator shall rule in the decision following the hearing;
 (4) The right to call witnesses, including employees of the Department, Nevada, and any other party;
 (5) The right to full discovery of pertinent documents and information in the possession of either HEW or Nevada;
 (6) The right to timely notice of all future proceedings in this matter;
 (7) The right to participate in any pre-determination conferences and;
 (8) Any further rights as shall be necessary to enable NWRO to fully and adequately represent the interest of welfare recipients in this hearing.
 
 
 [19]
 With regard to the Work Incentive Program, the Nevada groups indicate a concern that HEW might permit the state to conduct a program which does not cover all counties and that neither HEW nor Nevada will testify to or present evidence on the extent to which work rules more restrictive than those specified in the WIN program are or will be in force in non-WIN counties. Although the proposed issues focused on Nevada's failure topay for suitable day care for welfare recipients who wish to work, no attention is likely to be given to the need for the state agency to find suitable day care, it is claimed.
 
 
 [20]
 The Nevada order directed that appellants be permitted the same procedural rights as exercised by the other parties to the conformity hearing, if such were actually held, but it did not obstruct the pursuit of an agreement of compliance through informal negotiations between the Department and the state without appellants' participation therein. The same directions were to hold as to the Connecticut hearing except to the extent that the restrictions were inapplicable to "(1) the giving of testimony by witnesses for the State of Connecticut now present in Washington, D. C., and (2) their cross-examination by representatives of the Department of Health, Education and Welfare."
 
 
 [21]
 "Our position, however, is that under the law and regulations, 42 U.S.C. 604 (a) and 45 CFR 201.5, only the State of Nevada, acting through the Department of Health, Welfare, and Rehabilitation, the State agency administering the Nevada AFDC plan, has a right to notice and opportunity for a hearing or otherwise to participate as a party in the proceedings initiated pursuant to such provisions. Our consistent practice has been to deny the request of anyone other than the State involved to participate as a party and, in the exercise of discretion, to permit interested persons, in the capacity ofamici curiae, to submit written statements containing information and views relating to the issues, to attend the hearing, and to be afforded opportunity to make oral statements of their views at the hearing. * * *" Affidavit of Mary Switzer, Administrator, Social and Rehabilitation Service, Department of Health, Education and Welfare, December 16, 1969.
 
 
 [22]
 See, e. g., Elm City Broadcasting Corp. v. F. C. C., 98 U.S.App.D.C. 314, 235 F.2d 811 (1956) ("party in interest" to Federal Communications Commission proceeding); City of Houston, Texas v. C.A.B., 115 U.S.App.D.C. 94, 317 F.2d 158 (1963) (party with "substantial interest" before Civil Aeronautics Board).
 
 
 [23]
 See Virginia Petroleum Jobbers Ass'n v. F.P.C., 105 U.S.App.D.C. 172, 265 F. 2d 364 (1959); National Coal Ass'n v. F.P.C., 89 U.S.App.D.C. 135, 191 F.2d 462 (1951).
 
 
 [24]
 For discussion of explicit provisions,see W. Gellhorn & C. Byse, Administrative Law — Cases and Comments 831-834 (1960).
 
 
 [25]
 Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153 n. 1, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 
 
 [26]
 1 K.Davis, Administrative Law Treatise § 8.11 at 564 (1958)
 
 
 [27]
 Office of Communication of United Church of Christ v. F.C.C., 123 U.S. App.D.C. 328, 334 n. 8, 359 F.2d 994, 1000 n. 8 (1966)See Association of Data Processing Service Organizations v. Camp, supra Note 25; F.C.C. v. N.B.C. (KOA), 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943); Virginia Petroleum Jobbers Ass'n v. F.P.C., supra Note 23.
 A seemingly contrary viewpoint is that "standing to sue is not to be equated to participation in an administrative proceeding," and that "access to administrative agency proceedings rests on a different basis from standing to sue in this Court." National Motor Freight Traffic Ass'n v. United States, 205 F. Supp. 592 (D. D.C.), affirmed, 371 U.S. 223, 83 S.Ct. 311, 9 L.Ed.2d 273 (1962), rehearing denied and opinion clarified, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963) (disagreement with lower court that appellants lacked standing to challenge the order of the Interstate Commerce Commission). The point in National Motor Freight, however, was that standing to sue depended on more restrictive criteria than standing to appear before administrative agencies, i. e., that intervention in the latter did not provide a certain path to judicial review. See Pittsburgh & W. Va. Ry. v. United States, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980 (1930).
 
 
 [28]
 Office of Communication of United Church of Christ v. F.C.C.,supra Note 27, 123 U.S.App.D.C. at 334, 359 F.2d at 1000.
 
 
 [29]
 A thoroughgoing survey of the developments in the "standing to sue" concept has been set forth in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). Similarly, in the intervention area,see Office of Communication of United Church of Christ v. F.C.C., supra Note 27.
 
 
 [30]
 "Reviewability" of administrative action is an element of "standing" for the majority of the Court, but a question separable from standing by Mr. Justice Brennan's reasoning
 
 
 [31]
 By that provision, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (Supp. IV 1965-1968)
 
 
 [32]
 The statutory provision in the Upland Cotton program "indicate[d] a congressional intent to benefit the tenants. They are persons `aggrieved within the meaning of a relevant statute' as those words are used in 5 U.S.C. § 702." Barlow v. Collins, 397 U.S. 159, 164-165, 90 S.Ct. 832, 836 (1970). In discussing § 702, Mr. Justice Brennan says:
 "* * * Congressional intent that a particular plaintiff have review may be found either in express statutory language granting it to the plaintiff's class, or, in the absence of such express language, in statutory indicia from which a right to review may be inferred. Where, as in the instant cases, there is no express grant of review, reviewability has ordinarily been inferred from evidence that Congress intended the plaintiff's class to be a beneficiary of the statute under which the plaintiff raises his claim. See, for example, the Chicago Junction Case, 264 U.S. 258 [44 S.Ct. 317, 68 L.Ed. 667] (1924); Hardin v. Kentucky Utilities Co., 390 U.S. 1 [88 S.Ct. 651, 19 L.Ed.2d 787] (1968); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (C.A.2d Cir. 1968). * * *"
 Barlow v. Collins, supra, 397 U.S. at 174-175, 90 S.Ct. at 842 (concurring opinion). (Footnote omitted.)
 
 
 [33]
 Even if no congressionally conferred source for standing is discernible, argue appellants, the due process clause of the Fifth Amendment requires their participation since they have substantive legal rights which cannot be taken without due process of law. In their demand for standing within both the provisions of the Administrative Procedure Act and the purview of the due process clause, appellants have characterized their interest as a legally protected one. The Supreme Court's decisions in Wheeler v. Montgomery, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970), and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), confirm the substantiality of qualified welfare recipients' interest in benefitsSee King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Rothstein v. Wyman, 303 F.Supp. 339 (S.D.N.Y.1969). Before termination of public assistance payments by states, recipients must first be given an opportunity to appear personally, with counsel, to offer evidence and to confront and cross-examine witnesses. Relevant constitutional restraints apply to withdrawal of public assistance benefits. For qualified recipients, welfare is the means for obtaining essential food, clothing, housing and medical care. Goldberg v. Kelly, supra, 397 U.S. at 264, 90 S.Ct. at 1018. Because we have determined in the present case that standing to intervene is not dependent on the existence of a legally protected interest, but rather is contingent upon a legislative grant of a benefit, the due process contention need not be reached.
 
 
 [34]
 If the Secretary finds there is conformity, and hence the flow of federal funds is uninterrupted, appellants may claim that by his action they are prevented from participating in a fully complying program which would be in effect had the Secretary found nonconformity and thus stimulated the states to adjust their laws. Or if the Secretary fails to call the states to account for maladministration of a conforming plan, the welfare recipients may have reason to complain. Under 42 U.S.C. § 604(a) and 45 C.F.R. § 201.5 the Secretary is to terminate payments if he finds either (1) that the plan has changed so much that it no longer complies, or (2) that in the administration of the plan there is a failure to comply. More importantly, if the Secretary finds nonconformity and terminates federal grants, appellants may allege that they are being cut off from welfare payments without being afforded a hearingCf. Goldberg v. Kelly, supra Note 33.
 
 
 [35]
 Cf. Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969); Peoples v. U. S. Dept. of Agriculture, 138 U.S.App. D.C. ___, 427 F.2d 561 (1970).
 
 
 [36]
 Establishment of criteria for need and other factors of eligibility is left largely to the states. King v. Smith, 392 U.S. 309, 318-319, 88 S.Ct. 2128 (1968)
 
 
 [37]
 79 Cong.Rec. 12793 (1935) (excerpt from Conference Report-Social Security H.R. 7260). In particular, the stated goal of the program of Aid to Families with Dependent Children is expressly:
 "For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. * * *"
 42 U.S.C. § 601.
 
 
 [38]
 "Pertinent statutory language, legislative history and public policy considerations must be examined to determine whether Congress precluded all judicial review, and, if not, whether Congress nevertheless foreclosed review to the class to which the plaintiff belongs." Barlow v. Collins,supra Note 32, 397 U.S. at 173, 90 S.Ct. 841 (concurring opinion). With the enactment of the review section, § 1316, there is no evidence that Congress "precluded all judicial review."
 
 
 [39]
 111 Cong.Rec. 3067 (1965) (remarks of Senator Javits and excerpt from Advisory Commission on Intergovernmental Relations — May 1964)
 
 
 [40]
 
 "* * * [W]e have held time and again that the court is bound by the Commission's fact findings. To contend, therefore, that petitioner has an adequate remedy, when it is bound by facts found without its intervention and without an opportunity on its part to be heard, is to effectively foreclose its rights before they are known and render an appeal to this court, on a record to which it is a stranger, wholly bootless. True enough, it may be the right of the Commission to determine the `equities' which shall control, but to command approval it must act judicially, must hear and weigh the evidence, and exercise its powers fairly and equitably; and this it cannot do by closing its ears to the proffer of testimony in behalf of one whose legal rights are put in jeopardy and who seasonably applies for a hearing. * * *"
 Sykes v. Jenny Wren Co., 64 App.D.C. 379, 385, 78 F.2d 729, 735 (1935) (dissenting opinion).
 
 
 [41]
 42 U.S.C. § 1316(a) (4). A remand of an agency's order for the conducting of a new and full hearing with participation by interested parties has been used as a post-hearing solution to improper exclusion of those parties. Scenic Hudson Preservation Conference v. F. P.C., 354 F.2d 608 (2d Cir. 1965); Elm City Broadcasting Co. v. F.C.C.,supra Note 22.
 
 
 [42]
 79 Cong.Rec. 12793 (1935) (excerpt from Conference Report — Social Security H.R. 7260)
 
 
 [43]
 3 K. Davis, Administrative Law Treatise § 22.08 at 241 (1958)
 
 
 [44]
 Office of Communication of United Church of Christ v. F.C.C.,supra Note 27, 123 U.S.App.D.C. at 340, 359 F.2d at 1006.
 
 
 [45]
 Scenic Hudson Preservation Conference v. F.P.C.,supra Note 41, 354 F.2d at 617.
 
 
 [46]
 To the extent that appellees are apprehensive of chaos and confusion as an incident to this enlarged right, we remind that they have already recognized the right of appellants to be present at the hearings and to be heard through counsel. Reliance for proper control of the hearings and the orderly compilation of the hearing record must, of course, be on the hearing examiner. He is fully authorized to be the arbiter of the relevance of proffered testimony and of the proper scope of cross-examination, and to insist that all parties address themselves to the business at hand with dignity and dispatch